**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CA No. __2:20-cv-2369-BHH__ *SEALED* |
| *ex rel*. [UNDER SEAL], | |
| Relator, | |
| v. | **COMPLAINT** |
| [UNDER SEAL] | **(Jury Trial Demanded)** |
| Defendants. | |

# FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (Exempt from ECF)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CA No. __2:20-cv-2369-BHH__  *SEALED* |
| Plaintiff, | |
| *ex rel.* Ratliff CPA Firm, P.C., | |
| Relator, | **COMPLAINT** |
| v. | **(Jury Trial Demanded)** |
| First Reliance Bank; First-Citizens Bank & Trust Company; Intuit Inc. and Intuit Financing, Inc. d/b/a QuickBooks Capital; Pinnacle Bank; The Citizens Bank; and, Truist Bank, | |
| Defendants. | |

**INTRODUCTION**

1.      Relator, Ratliff CPA Firm, PC ("Relator" or "Ratliff"), brings this Complaint on behalf of itself and the United States of America pursuant to the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*, against Defendants: First Reliance Bank (hereinafter "First Reliance"); First-Citizens Bank & Trust Company (hereinafter "First-Citizens"); Intuit Inc. and Intuit Financing Inc. d/b/a QuickBooks Capital (together hereinafter "Intuit"); Pinnacle Bank (hereinafter "Pinnacle"); The Citizens Bank (hereinafter "Citizens"); Truist Bank (hereinafter "Truist") (collectively "Defendants") to recover damages and civil penalties arising from a scheme to submit and the actual submission of false claims for payment to the Small Business Administration ("SBA"). Said scheme involved Defendants' repeated refusal to comply with the Coronavirus Aid, Relief, and Economic Security ("CARES") Act regulations related "Lender's

Fees"[1] received for processing Paycheck Protection Program ("PPP") loans. While obtaining these generous Lender's Fees, in direct contravention of PPP regulations,[2] Defendants repeatedly refused to pay for services performed by Relator and other agents rendered on behalf of recipients of SBA 7(a) emergency loans. This scheme resulted in Defendants illegally retaining more money from the SBA than they were entitled under the CARES Act.

2.    Ratliff brings this *qui tam* action on behalf of Small Business Administration and, to end Defendants' fraud and recoup monies wrongfully paid by SBA, plus treble damages and statutory penalties, Relator would respectfully show the Court as follows:

## JURISDICTION AND VENUE

3.    This action arises under the FCA. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1345 and 31 U.S.C. §§ 3730(b) & 3732(a).

4.    The Court has personal jurisdiction over Defendants because each Defendant transacts business in this District and numerous acts prohibited by federal law occurred in this District.

5.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a).

6.    Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. To the extent that there has

---

[1] Lender's Fees are discussed in detail *infra*.

[2] For purposes of this complaint "PPP Regulations" refer to those found at 85 Fed. Reg. 20811-20817 (Apr. 15, 2020). Additional regulations have been issued at 85 Fed. Reg. 21747-21752 (April 20, 2020) and 85 Fed. Reg. 36997-37000 (June 19, 2020). These additional regulations do not impact the allegations in this Complaint.

been a public disclosure unknown to Relator, he is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and/or the public disclosure is a result of Relator voluntarily providing this information to the United States Government prior to filing this *qui tam* action.

## PARTIES

7.    Plaintiff United States of America and its department, the U.S. Small Business Administration (SBA) is the victim of the fraud described here and the real party in interest as to Ratliff's claims under 31 U.S.C. § 3729.

8.    Relator Ratliff, is a South Carolina Professional Corporation with its principal place of business in Mount Pleasant, South Carolina. Ratliff provides corporate and individual taxation advice to its clients and performs financial planning and consulting for both businesses and individuals in the local community. Ratliff meets the criteria to be a PPP Agent under the CARES Act.

9.    On information and belief, Defendant First Reliance is a South Carolina corporation with its principal place of business in Florence, South Carolina, that provides, *inter alia*, banking services to individuals and businesses. On information and belief, First Reliance conducts substantial business in this District either directly and/or through its subsidiaries and/or affiliates.

10.    On information and belief, Defendant First-Citizens is a North Carolina corporation with its principal place of business in Raleigh, North Carolina, that provides, *inter alia*, banking services to individuals and businesses. On information and belief, First-Citizens conducts substantial business in this District either directly and/or through its subsidiaries and/or affiliates.

11.    Defendant Intuit, Inc. is incorporated in the State of Delaware and headquartered in Mountain View, California. Defendant Intuit Financing Inc., d/b/a QuickBooks Capital is a wholly owned subsidiary of Intuit, Inc.

12.    On information and belief, Defendant Pinnacle is a Tennessee corporation with its principal place of business in Nashville, Tennessee, that provides, *inter alia*, banking services to individuals and businesses. On information and belief, Pinnacle conducts substantial business in this District either directly and/or through its subsidiaries and/or affiliates.

13.    On information and belief, Defendant Citizens is a South Carolina corporation with its principal place of business in Florence, South Carolina, that provides, *inter alia*, banking services to individuals and businesses. On information and belief, Citizens conducts substantial business in this District either directly and/or through its subsidiaries and/or affiliates.

14.    On information and belief, Defendant Truist is a North Carolina corporation with its principal place of business in Charlotte, North Carolina, that provides, *inter alia*, banking services to individuals and businesses. On information and belief, Truist conducts substantial business in this District either directly and/or through its subsidiaries and/or affiliates.

15.    When in this Complaint reference is made to any act of any Defendant, such shall be deemed to mean that officers, directors, agents, employees, or representatives of the Defendant named in this lawsuit committed or authorized such acts, or failed and omitted to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of the Defendant and did so while acting within the scope of their employment or agency.[3]

## RELEVANT BACKGROUND

---

[3] Relator is aware that in South Carolina alone, there are at least 58,300 approved loans for a total of $5,643,833,539 to small businesses in this state. *See* U.S. Small Business Administration Paycheck Protection Program (PPP) Report, Approvals through 05/23/2020, https://home.treasury.gov/system/files/136/SBA-Paycheck-Protection-Program-Loan-Report-Round2.pdf (last accessed May 26, 2020).

16.    The spread of COVID-19 was declared a pandemic by the World Health Organization ("WHO") on March 11, 2020.

17.    On March 13, 2020, President Donald Trump issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia."

18.    The Federal Government expressly recognized that with the COVID-19 emergency, "many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State and local public health measures that are being taken to minimize the public's exposure to the virus."[4]

19.    The economic fallout from COVID-19, and the national response to it, was immediate and enormous.  As "stay at home" issues were ordered by states across the nation, countless businesses were forced by law to overhaul their business models, scale back their business dramatically, or shutter–either temporarily or permanently.  Businesses were further harmed as the public began to avoid all public spaces.  Furloughs and layoffs were rampant in the private sector.

20.    On March 25, 2020, in response to the economic damage caused by the COVID-19 crisis and the overwhelming public pressure that resulted from it, the U.S. Senate passed the Coronavirus Aid, Relief, and Economic Security, or CARES, Act.  The CARES Act was passed by the House of Representatives the following day and signed into law by President Trump on

---

[4] *See Business Loan Program Temporary Changes; Paycheck Protection Program,* 13 CFR Part 120, Interim Final Rule ("SBA PPP Final Rule").

March 27, 2020.  Amounting to approximately $2 trillion, the CARES Act was the single-largest economic stimulus bill in American history.

21.    Critically, the CARES Act created a $659 billion loan program for businesses with fewer than five hundred employees, the PPP.[5]  The goal of the PPP was to provide American small businesses with eight weeks of cash-flow assistance, with a certain percentage forgivable if utilized to retain employees and fund payrolls.  The loans are fully federally guaranteed and administered by the SBA.[6]

22.    The PPP loans operate more like grants if the recipient follows certain rules, including that at least 75 percent of the loan goes toward payroll.[7]  Businesses that follow the rules are permitted to submit a request to their SBA lender for total forgiveness.  Otherwise, the loan matures in two years and carries a one percent interest rate.[8]

23.    The SBA was charged with creating the PPP implementing regulations.  The SBA issued the first interim final rule ("Initial Rule") on April 2, 2020, allowing businesses to begin applying for PPP loans with all SBA lenders on April 3, 2020.

24.    An important piece of the PPP was that applications were to be processed and funded on a "first-come, first-served" basis—that is, the SBA was to process applications and distribute funds based on the order in which they were received.  This made the SBA's list of

---

[5] The initial $349 billion in funding was all allocated within the span of thirteen (13) days, stopping many small businesses from taking advantage of the PPP. Accordingly, Congress approved an additional $310 billion in funding through the Paycheck Protection Program and Health Care Enhancement Act, signed by President Trump on April 24, 2020.

[6] Small Bus. Admin., Docket No. SBA-2020-0015, 13 CFR Part 120, Paycheck Protection Program 3245-AH34, Interim Final Rule, 85 Fed. Reg. 20814 § (2)(o) (Apr. 15, 2020).

[7] 85 Fed. Reg. 20812 § (2)(e); *id*. at 20813 § (2)(o).

[8] *Id.* at 20813 § (2)(j).

approved lenders key gatekeepers in this process, which the lenders certainly understood. As the Initial Rule makes clear, "[a]ll loans will be processed by all lenders under delegated authority." Thus, the Lenders were tasked with administering and processing these loans on behalf of the SBA.

25.    Because the PPP was to be administered only through SBA-approved lenders, and because applicants were applying for funds from the single pot allocated for the program, submitting an accurate application for a loan through the SBA-approved lender as quickly as possible was critical.

26.    Congress added an incentive for the SBA-affiliated lenders, knowing they would be inundated with PPP loan applications:  for each loan processed and approved, the bank would receive a Lender's Fee of five percent for loans up to $350,000; three percent for loans between $350,000 and $2 million; and one percent for loans between $2 million and $10 million.[9]

27.    With similar incentives in mind, Congress and the SBA also carved out a specific benefit for the countless accountants, attorneys, and advisors who would need to lead or assist their clients in preparing and filing PPP loan applications.  These individuals and entities are referred to as "Agents" in the CARES Act and PPP Regulations.

28.    As explained in the PPP Information Sheet provided for "lenders," the SBA states that '[a]n 'Agent' is an authorized representative and can be: an attorney; an accountant; a consultant; someone who prepares an applicant's application for financial assistance and is employed and compensated by the applicant; someone who assists a lender with originating, disbursing, servicing, liquidating, or litigating SBA loans; a loan broker; or any other individual or entity representing an applicant by conducting business with the SBA."[10]

---

[9] *Id.*

[10]  U.S. Department of the Treasury, Small Business Paycheck Protection Program Information For Lenders, Originally posted on March 31, 2020,

29.    PPP Regulations provide that "Agent fees **will** be paid out of lender fees.  The lender will pay the agent.  **Agents may not collect any fees from the applicant**.  The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP" loan is as follows ("Agent Fees"): one percent (1%) for loans up to $350,000; 0.50% for loans between $350,000 and $2 million; and 0.25% for loans between $2 million and $10 million."[11]

30.    Within this context, Congress and the SBA set up a straightforward system for the disbursement of PPP loan funds where the applicant is assisted by an Agent: (i) the Agent prepares the application and/or necessary supporting application documents for the client; (ii) the client or Agent applies for the PPP loan through the lender; (iii) the lender submits the application to the SBA; (iv) the SBA approves the loan and sends the client the money through the lender, and eventually the SBA pays the Lender's Fee; and (v) the Agent submits the request for fee payment to the lender with the Agent's fee based upon (a) the work performed for the client and (b) the caps on Agent Fees provided by PPP regulations.

31.    Unfortunately, Defendants are repeatedly refusing to pay Agent Fees for their assistance in providing an accurate and truthful application for funding.

32.    As to each Defendant, refusal to pay Agent Fees is a company-wide policy.  Further, the fact that all Defendants set up an application wherein the borrower/applicant is not asked if they utilized an agent to assist them suggests that Defendants did not want to have any record of the agent information in its files.

---

https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed May 26, 2020)

[11] *Id*. (emphasis added); *see also,* 85 Fed. Reg. 20816 § (4)(c)

33.     This policy of refusal to pay Agent Fees that *only* the lenders are authorized and required to pay, stands as an immediate threat to the effective administration of the PPP program. In the midst of an unprecedented economic/pandemic crisis, this policy represents short-sighted profit-padding at best, and blatantly illegal conduct, at worst.

34.     Making matters worse, the refusal to pay agent fees, and the refusal to implement systems even remotely establishing the ability to adequately distribute these fees, has resulted in some agents, in contravention of the regulations, directly billing the borrowers. Resulting in Defendants making more money, while the individuals these loans were made to assist are being charged illegal fees.

35.     Additionally, refusing to pay Agent Fees is in direct conflict with the certifications required by the SBA in the "CARES Act Section 1102 Lender Agreement." This agreement requires certifications, under penalty of perjury, that the lenders (i) "is in compliance and will maintain compliance with all applicable requirements of the [PPP], and PPP Loan Program Requirements[,]" (ii) will "service and liquidate all covered loans made under the Paycheck Protection Program in accordance with PPP Loan Requirements[,] and (iii) will "close and disburse each covered loan in accordance with the terms and conditions of the PPP Authorization and PPP Loan Requirements."[12]

36.     To the extent that any Defendant had to certify, at any point, that it would follow the PPP's regulations in making PPP loans, said certification was false. Defendants' policies to

---

[12] U.S. Small Business Administration CARES Act Section 1102 Lender Agreement, https://www.sba.gov/sites/default/files/2020-04/SBA%20Form%203506%20CARES%20Act%20Section%201102%20Lender%20Agreement%2004022020.pdf (last accessed May 26, 2020)

refuse to pay third-party Agents Fees directly violates the PPP's implementing regulations and Defendant's certification regarding compliance.

37.    As a result of these false certification, express and implied:

- Defendant Truist was able to process over 72,000 PPP applications worth over $12.6 billion in funding, for an average loan of approximately $175,000.  Assuming a conservative average fee of four percent, Truist has been allocated over $504 million in Lender's Fees, from which they were required to pay out Agent Fees.

- Defendant First Reliance "accepted "798 PPP loan applications totaling $58 million" in loans through the Small Business Administration's Paycheck Protection Program. The average PPP loan First Reliance approved was thus worth approximately $72,681. Assuming a conservative average fee of four percent, First Reliance has been allocated over $2.32 million in Lender's Fees, from which they were required to pay out Agent Fees.

- Defendant First-Citizens processed loans for "nearly 23,000 businesses . . . totaling $3.2 billion through the Small Business Administration's Paycheck Protection Program."[13]  The average PPP loan First-Citizens approved was worth approximately $139,130.  Assuming a conservative average fee of four percent, First-Citizens has been allocated over $128 million in Lender's fees, from which they were required to pay out Agent Fees.

- Defendant Intuit from April 30, 2020 until May 20, 2020, processed "just over $875 million of approved small business loans to customers from the PPP" through the Small

---

[13]    *See FirstCitizens Bank SBA Paycheck Protection Program Update*, available at https://www.firstcitizens.com/paycheck-protection-program (last visited May 28, 2020).

Business Administration's program.[14]  Intuit processed "an average loan size of $40,000 for small businesses and $7,000 for self-employed individuals."[15] Accordingly, Intuit processed PPP loans for approximately 18,615 total small businesses and self-employed individuals. Assuming a conservative average fee of four percent, Intuit has been allocated thus far approximately $35 million in Lender's Fees in the span of twenty days, from which they were required to pay Agent Fees.

- Defendant Pinnacle "originated more than $2.4 billion in loans to nearly 14,000 small businesses" through the Small Business Administration's Paycheck Protection Program.[16]  The average PPP loan Pinnacle approved was thus worth approximately $171,428.  Assuming a conservative average fee of four percent, Pinnacle has been allocated over $96 million in Lender's Fees, from which they were required to pay out Agent Fees.

- Defendant Citizens was very active in processing PPP loans, for which it received substantial Lender's Fees, from which they were required to pay out Agent Fees.

38.    Ultimately, despite knowing that they were required to pay Agents Fees as a percentage of their PPP Lender's fees, and despite certifying to the SBA that they would follow this obligation, as a matter of policy and routine course, in the processing of millions of PPP loans,

---

[14]*See Intuit Third Quarter Financial Results*, available at https://www.businesswire.com/news/home/20200521005704/en/Intuit-Quarter-Revenue-Declined-8-Percent-Small (last visited June 11, 2020).

[15] *See The QuickBooks Blog*, available at https://quickbooks.intuit.com/blog/customer-profile/how-quickbooks-capital-streamlined-the-ppp-loan-process-for-the-smallest-of-small-businesses/ (last visited June 11, 2020).

[16] *See Pinnacle Bank SBA Paycheck Protection Program Update*, available at https://www.pnfp.com/about-pinnacle/media-room/news-releases/pinnacle-loans-70-million-to-western-virginia-companies-in-the-paycheck-protection-program (last visited June 4, 2020).

Defendants refused to pay Agent fees, choosing to illegally retain the full balance of their lender fees.

39.    Moreover, if an Agent assisted an applicant in preparing and submitting an application to Defendants, despite a regulatory obligation to compensate agents, Defendants elected not to ask borrowers whether they utilized an "Agent" (or purposely left off this inquiry when developing its application procedures). Moreover, even when confronted with the obligation to pay Agent Fees by Relator, Defendants have refused to pay agent fees. Instead, improperly retaining the entirety of the Lender's Fees.

### PPP AGENT FEE REGULATIONS AND REQUIRED CERTIFCATIONS

40.    The SBA application created specifically for PPP participation requires, "as a condition and in consideration of authorization…for Lender to make Paycheck Protection Program SBA-guaranteed financing available…to eligible recipients," submission of a SBA Form 3506 ("CARES Act Section 1102 Lender Agreement"). In this agreement, a Lender must make the following certifications:

> To the best of its knowledge, Lender certifies that it is in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program, and PPP Loan Program Requirements…

> By signing below, I hereby certify that I have the authority to execute this Agreement for the Lender on whose behalf I am signing, and that all representations made are true and correct to the best of my knowledge. I further acknowledge that on behalf of the Lender I have also submitted an Incumbency Certificate attached hereto. I further acknowledge that any false statements made to the U.S. Small Business Administration and Department of the Treasury can result in criminal prosecution under 18 U.S.C. § 1001, 15 U.S.C. § 645, and other provisions and imposition of civil money penalties under 31 U.S.C. § 3729.

41.    This CARES Act Section 1002 Lender Agreement ties a condition of participation in the PPP program to an express certification of continued compliance with all applicable requirements of the PPP program.

42.    SBA's Initial Rule, allowing implementation of PPP, found at 85 Fed. Reg. 20811 20817 (Apr. 15, 2020), expressly required the following:

- "Lenders must comply with the applicable lender obligations set forth in this interim final rule"

- "[L]enders will receive a substantial processing fee from the SBA provide ample inducement for lenders to participate in the PPP."

- "SBA will pay lenders fees for processing PPP loans in the following amounts: i. Five (5) percent for loans of not more than $350,000; ii. Three (3) percent for loans of more than $350,000 and less than $2,000,000; and iii. One (1) percent for loans of at least $2,000,000."

- "Agent fees will be paid by the lender out of the fees the lender receives from SBA."

- "Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds."

43.    The SBA PPP Final Rule also requires submission of SBA Form 2484 ("Lender's Application – Paycheck Protection Program Loan Guaranty") for each PPP loan, in which the Lender certifies:

- "The Lender has complied with the applicable lender obligations set forth in paragraphs 3.b(i)-(iii) of the Paycheck Protection Program Rule."

- "The Lender has obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts) of the Applicant and will retain copies of such documents in the Applicant's loan file."[17]

---

[17] Section 3.b(i)-(iii) provides:

   Each Lender Shall:

**FACTUAL ALLEGATIONS CONCERNING DEFENDANTS' SPECIFIC REFUSAL TO FOLLOW REGULATIONS REGARDING AGENT FEESS**

44.    Ratliff is a CPA firm with locations in Mount Pleasant, South Carolina; Sumter, South Carolina; and Mt. Prospect, Illinois. John W. Ratliff, III, the sole owner of Ratliff, has been a professional accountant since 1975 and has provided public accounting services to clients for thirty-six (36) years.  Ratliff currently has approximately 1,000 clients that it services between its three locations. Upon information and belief, approximately 50 are small businesses and/or sole proprietorships. Ratliff, knowing that the COVID-19 crisis would significantly impact clients' businesses, sought to obtain PPP loans through various SBA-approved lenders on behalf of clients.

45.    Ratliff's professionals spent considerable time familiarizing themselves with the CARES Act and the related SBA Regulations, in particular (a) Section 1102, which permits the SBA to guarantee 100% of Section 7(a) loans under the PPP and (b) Section 1106 of the Act, which provides forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

46.    In or about March, April and May 2020, Ratliff assisted many clients in the gathering and analysis of their documents, as well as the calculations and preparation of the loan applications.

---

i.    Confirm receipt of borrower certifications contained in Paycheck Protection Program Application form issued by the Administration;

ii.    ii. Confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020;

iii.    iii. Confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application;

47.     Based on the SBA Regulations, Ratliff understood that it was not allowed to charge clients a fee relating to the application process.  The agents were only allowed to receive compensation from the agents' share of the estimated $20 billion in fees that the Federal Government paid the Lenders for originating the PPP loans.

48.     For its clients, Ratliff had the primary role in calculating the payroll information needed for the application, and providing the clients' accounting information, advice, documentation in support of the PPP loan application, and will have ongoing responsibility for advising on the forgiveness of the PPP loan.

## AS TO TRUIST

49.     Ratliff provided PPP services to three clients (hereinafter, "Client SK," "Client SC," and "Client SL") who obtained PPP loans from Truist. Client SK obtained a PPP loan from Truist in the amount of $20,813 on April 21, 2020.  Based upon information and belief, Truist was paid or will be paid, an origination fee of $1,040.65, of which Ratliff is entitled to $208.13 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation. Client SC applied for and obtained a PPP loan from Truist on April 21, 2020 in the amount of $73,296. In accordance with PPP regulations, Truist has been paid or will be paid, an origination fee of $3,644.80, of which Ratliff is entitled to $732.96 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation. Client SL applied for and obtained a PPP loan from Truist on April 21, 2020 in the amount of $87,400. In accordance with PPP regulations, Truist has been paid or will be paid, a Lender's Fee of $4,370, of which Ratliff is entitled to $874 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

50.     For Client SK, Client SC and Client SL to obtain PPP loans, and for Truist to obtain the associated Lender's Fees, Truist had to have submitted both an application to participate in the PPP program, and a specific SBA form 2484 for each loan. Explicit in the application and implicit in the SBA Form 2484 is the representation that Truist had complied and was continuing to comply with PPP regulations, including those dealing with Agent Fees. Both the application and the Form 2484 constitute claims and/or statements required by the SBA for payment of the Lender's Fees. Based upon the blanket failure to pay the Agent Fees requested by Relator, these claims and/or statements were in fact false, or, through Truist's actions, caused to be false.

51.     Additionally, the Lender's Fees obtained by Truist associated with the Client SK, Client, SC, and Client SL loans was money of which Truist was able to obtain through the authority delegated to it by the SBA. With this delegation of authority came certain requirements (PPP Regulations) including the payment of Agent Fees. As such, the Lender's Fees were, at least in part, Government funds in the possession of Truist for the purpose of compensating Agents. However, despite the delegation of SBA authority and clear regulatory directive by the SBA, Truist did not deliver the Agent Fees as required, instead illegally retaining the entirety of the funds.

52.     Restated, Truist did not comply with the PPP Regulations because it has not paid Ratliff and continues to refuse to pay any agent fees despite awarding PPP loans to Ratliff's clients for whom Ratliff acted as a PPP Agent. Instead, Truist retained all of the Agent Fees for itself.

53.     Truist has refused to respond to the inquiries made about payment of Ratliff's fees for service as PPP Agent.

## AS TO FIRST-CITIZENS

54.     Ratliff provided PPP services to two clients (hereinafter, "Client BP" and "Client JM") who obtained PPP loans from First-Citizens. Client BP obtained a PPP loan from First-

Citizens in the amount of $67,300 on April 20, 2020. In accordance with PPP regulations, First-Citizens has been paid or will be paid, an origination fee of $3,365, of which Ratliff is entitled to $637.00 (1% of total loan amount) of that fee for their work as the agent of the borrower in submitting the application and documentation. Client JM applied for and obtained a PPP loan from First-Citizens on April 15, 2020 in the amount of $24,939. Based upon information and belief, First-Citizens was paid or will be paid, an origination fee of $1,246.95, of which Ratliff is entitled to $249.39 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

55.     For Client BP and Client JM to obtain PPP loans, and for First-Citizens to obtain the associated Lender's Fees, First-Citizens had to have submitted both an application to participate in the PPP program, and a specific SBA form 2484 for each loan. Explicit in the application and implicit in the SBA Form 2484 is the representation that First-Citizens had complied and was continuing to comply with PPP regulations, including those dealing with Agent Fees. Both the application and the Form 2484 constitute claims and/or statements required by the SBA for payment of the Lender's Fees. Based upon the blanket failure to pay the Agent Fees requested by Relator, these claims and/or statements were in fact false, or, through First-Citizens' actions, caused to be false.

56.     Additionally, the Lender's Fees obtained by First-Citizens associated with the Client, BP and Client JM loans was money of which First-Citizens was able to obtain through the authority delegated to it by the SBA. With this delegation of authority came certain requirements (PPP Regulations) including the payment of Agent Fees. As such, the Lender's Fees were, at least in part, Government funds in the possession of First-Citizens for the purpose of compensating Agents. However, despite the delegation of SBA authority and clear regulatory directive by the

SBA, First-Citizens did not deliver the Agent Fees as required, instead illegally retaining the entirety of the funds.

57.     Restated, First-Citizens did not comply with the SBA Regulations because it has not paid Ratliff any Agent Fees despite awarding PPP loans to Ratliff's clients for whom Ratliff acted as a PPP Agent.

58.     Instead, First-Citizens retained all of the Agent Fees for itself. Ratliff asked First-Citizens about payment of its fees as PPP Agent, to which First-Citizens responded that "the bank made the decision [it] would not pay agent fees for the PPP loans."

## AS TO INTUIT

59.     Ratliff provided all of these services to one client (hereinafter, "Client VB") who obtained a PPP loan from Intuit. Client VB obtained a PPP loan from Intuit in the amount of $26,652.00 on June 3, 2020. Based upon information and belief, Intuit was paid or will be paid, an origination fee of $1,332.60, of which Ratliff is entitled to $266.52 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

60.     For Client VB to obtain PPP loans, and for Intuit to obtain the associated Lender's Fees, Intuit had to have submitted both an application to participate in the PPP program, and a specific SBA form 2484 for each loan. Explicit in the application and implicit in the SBA Form 2484 is the representation that Intuit had complied and was continuing to comply with PPP regulations, including those dealing with Agent Fees. Both the application and the Form 2484 constitute claims and/or statements required by the SBA for payment of the Lender's Fees. Based upon the blanket failure to pay the Agent Fees requested by Relator, these claims and/or statements were in fact false, or, through Intuit's actions, caused to be false.

61.    Additionally, the Lender's Fees obtained by Intuit associated with the Client VB loan was money of which Intuit was able to obtain through the authority delegated to it by the SBA. With this delegation of authority came certain requirements (PPP Regulations) including the payment of Agent Fees. As such, the Lender's Fees were, at least in part, Government funds in the possession of Intuit for the purpose of compensating Agents. However, despite the delegation of SBA authority and clear regulatory directive by the SBA, Intuit did not deliver the Agent Fees as required, instead illegally retaining the entirety of the funds.

62.    Restated, Intuit did not comply with the SBA Regulations because it has not paid Ratliff any Agent Fees despite awarding PPP loans to Ratliff's client for whom Ratliff acted as a PPP agent. Instead, Intuit retained all of the Agent Fees for itself.

63.    Intuit has refused to respond to the inquiries made about payment of Ratliff's fees for service as PPP agent.

## AS TO PINNACLE

64.    Ratliff provided PPP services to two clients (hereinafter, "Client SM" and "Client RW") who obtained PPP loans from Pinnacle. Client SM obtained a PPP loan from Pinnacle in the amount of $15,750 on April 29, 2020. Based upon information and belief, Pinnacle was paid or will be paid, an origination fee of $787.50, of which Ratliff is entitled to $157.50 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation. Client RW applied for and obtained a PPP loan from Pinnacle on April 21, 2020 in the amount of $7,692.50. Based upon information and belief, Pinnacle was paid or will be paid, an origination fee of $384.62, of which Ratliff is entitled to $76.93 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

65.    For Client SM and Client RW to obtain PPP loans, and for Pinnacle to obtain the associated Lender's Fees, Pinnacle had to have submitted both an application to participate in the PPP program, and a specific SBA form 2484 for each loan. Explicit in the application and implicit in the SBA Form 2484 is the representation that Pinnacle had complied and was continuing to comply with PPP regulations, including those dealing with Agent Fees. Both the application and the Form 2484 constitute claims and/or statements required by the SBA for payment of the Lender's Fees. Based upon the blanket failure to pay the Agent Fees requested by Relator, these claims and/or statements were in fact false, or, through Pinnacle's actions, caused to be false.

66.    Additionally, the Lender's Fees obtained by Pinnacle associated with the Client SM, Client, RM loans was money of which Pinnacle was able to obtain through the authority delegated to it by the SBA. With this delegation of authority came certain requirements (PPP Regulations) including the payment of Agent Fees. As such, the Lender's Fees were, at least in part, Government funds in the possession of Pinnacle for the purpose of compensating Agents. However, despite the delegation of SBA authority and clear regulatory directive by the SBA, Pinnacle did not deliver the Agent Fees as required, instead illegally retaining the entirety of the funds.

67.    Restated, Pinnacle did not comply with the SBA Regulations because it has not paid Ratliff any Agent Fees despite awarding PPP loans to Ratliff's clients for whom Ratliff acted as a PPP Agent. Instead, Pinnacle retained all of the Agent Fees for itself.

68.    Pinnacle has refused to respond to the inquiries made about payment of Ratliff's fees for service as PPP Agent.

## AS TO CITIZENS

69.     Ratliff provided all of these services to one client (hereinafter, "Client WA") who obtained a PPP loan from Citizens. Client WA obtained a PPP loan from Citizens in the amount of $33,659.00 on April 16, 2020. Based upon information and belief, Citizens was paid or will be paid, an origination fee of $1,682.95, of which Ratliff is entitled to $336.59 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

70.     For Client WA to obtain a PPP loan, and for Citizens to obtain the associated Lender's Fees, Citizens had to have submitted both an application to participate in the PPP program, and a specific SBA form 2484. Explicit in the application and implicit in the SBA Form 2484 is the representation that Citizens had complied and was continuing to comply with PPP regulations, including those dealing with Agent Fees. Both the application and the Form 2484 constitute claims and/or statements required by the SBA for payment of the Lender's Fees. Based upon the blanket failure to pay the Agent Fees requested by Relator, these claims and/or statements were in fact false, or, through Citizens' actions, caused to be false.

71.     Additionally, the Lender's Fees obtained by Citizens associated with the Client WA loan was money of which Citizens was able to obtain through the authority delegated to it by the SBA. With this delegation of authority came certain requirements (PPP Regulations) including the payment of Agent Fees. As such, the Lender's Fees were, at least in part, Government funds in the possession of Citizens for the purpose of compensating Agents. However, despite the delegation of SBA authority and clear regulatory directive by the SBA, Citizens did not deliver the Agent Fees as required, instead illegally retaining the entirety of the funds.

72.     Restated, Citizens did not comply with the SBA Regulations because it has not paid Ratliff any Agent Fees despite awarding PPP loans to Ratliff's client for whom Ratliff acted as a PPP agent.

73.     Instead, Citizens retained all of the Agent Fees for itself. Citizens has refused to respond to the inquiries made about payment of Ratliff's fees for service as PPP agent.

## AS TO FIRST RELIANCE

74.     Ratliff provided PPP services to one client (hereinafter, "Client SR") who obtained a PPP loan from First Reliance. Client SR obtained a PPP loan from First Reliance in the amount of $77,857.00 on May 15, 2020. Based upon information and belief, First Reliance was paid or will be paid, an origination fee of $3,892.85, of which Ratliff is entitled to $778.57 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

75.     For Client SR to obtain a PPP loan, and for First Reliance to obtain the associated Lender's Fees, First Reliance had to have submitted both an application to participate in the PPP program and a specific SBA form 2484. Explicit in the application and implicit in the SBA Form 2484 is the representation that First Reliance had complied and was continuing to comply with PPP regulations, including those dealing with Agent Fees. Both the application and the Form 2484 constitute claims and/or statements required by the SBA for payment of the Lender's Fees. Based upon the blanket failure to pay the Agent Fees requested by Relator, these claims and/or statements were in fact false, or, through First Reliance's actions, caused to be false.

76.     Additionally, the Lender's Fees obtained by First Reliance associated with the Client SR loan was money of which First Reliance was able to obtain through the authority delegated to it by the SBA. With this delegation of authority came certain requirements (PPP

Regulations) including the payment of Agent Fees. As such, the Lender's Fees were, at least in part, Government funds in the possession of First Reliance for the purpose of compensating Agents. However, despite the delegation of SBA authority and clear regulatory directive by the SBA, First Reliance did not deliver the Agent Fees as required, instead illegally retaining the entirety of the funds.

77.    Restated, First Reliance did not comply with the SBA Regulations because it has not paid Ratliff any Agent Fees despite awarding PPP loans to Ratliff's client for whom Ratliff acted as a PPP Agent. Instead, First Reliance retained all of the Agent Fees for itself.

78.    First Reliance has refused to respond to the inquiries made about payment of Ratliff's fees for service as PPP Agent.

**FOR A FIRST CAUSE OF ACTION**
**FCA VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A), (B) AND (D)**
**(AGAINST ALL DEFENDANTS)**

79.    Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

80.    At all times relevant to this action, Defendants were required to comply with PPP regulations, including those associated with the payment of Agent Fees.

81.    At all relevant times, Defendants certified that they were in and would continue to be in compliance with all PPP regulations.

82.    At all times relevant to this action, Defendants were also legally obligated to take corrective action upon discovering a violation of PPP regulations.

83.    Instead, Defendants knowingly and willfully violated their obligations through repeated refusals to pay Agent Fees in accordance with PPP regulations.

84.    Through these violations Defendants were able to receive Lender's Fees in excess of what they were legally entitled.

85.     To participate in the PPP Program and ultimately obtain Lender's Fees, SBA made as a condition precedent, a certification, at least for some Lenders, that said Lender was in compliance and would continue to be in compliance with PPP Regulations. To the extent any Defendant made a certification regarding compliance with PPP Regulations, said certification was false and used to influence the SBA.

86.     Moreover, to the extent any Defendant made a certification regarding compliance with PPP Regulations, Defendants' actions caused SBA to rely on said fraudulent certification.

87.     To obtain these Lender Fees, Defendants knowingly presented or caused to be presented express and/or implied false or fraudulent claims for payment and/or approval to participate in the PPP program.

88.     Through repeated violations of PPP regulations, Defendants took possession, custody, or control of money which was to be used, at the direction of the SBA, for Agent Fees and failed to deliver said money.

89.     Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (D), as amended.

## PRAYER

WHEREFORE, Relator on behalf of himself and the United States prays that:

i.      Defendants cease and desist from violating the FCA;

ii.     The Court enter judgment against Defendants jointly and severally:

1.      Awarding an amount equal to three times the damages the United States has sustained because of Defendants' conduct, plus civil penalties of at least $5,500 to $11,000, adjusted upward as specified by applicable law, for each violation of 31 U.S.C. § 3729;

2.      Awarding Relator the appropriate bounty pursuant to 31 U.S.C. § 3730; and

3.    Awarding Relator attorneys' fees and costs of this action, plus interest, including the costs to the United States and the States for their expenses related to this action;

iii.    That Defendants disgorge all sums by which they have been unjustly enriched by their illegal conduct;

iv.    That the United States and Relator receive all relief, both at law and at equity, to which they may reasonably be entitled; and

v.    That the Court order such further relief as it deems just and proper.

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury on all claims so triable.

Respectfully submitted by:

s/Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID No. 1730)
Christopher P. Kenney (Fed. ID No. 11314)
Phillip D. Barber (Fed. ID No. 103421)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
(803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com
cpk@harpootlianlaw.com
pdb@harpootlianlaw.com

Mark C. Tanenbaum (Fed I.D. No. 4071)
MARK C. TANENBAUM, P.A.
1017 Chuck Dawley Blvd., Suite 101
Mt. Pleasant, SC 29464
(803) 577-5100
Facsimile: (843) 722-4688
mark@tanenbaumlaw.com

Vincent A. Sheheen (Fed I.D. No. 7016)
Michael D. Wright (Fed I.D. No. 11452)
SAVAGE, ROYALL & SHEHEEN, L.L.P.
Post Office Drawer 10
Camden, SC 29021

(803) 432-4391
Facsimile:  (803) 425-4812
vsheheen@thesavagefirm.com
mwright@thesavagefirm.com

Richard D. McCune (*pro hac vice* motion forthcoming)
Michele M. Vercoski (*pro hac vice* motion forthcoming)
McCune Wright Arevalo llp
18565 Jamboree Road, Suite 550
Irvine, CA 92612
(909) 557-1250
Facsimile: (909) 557-1275
rdm@mccunewright.com
mmv@mccunewright.com

William Camden Lewis (Fed I.D. No. 12076)
RICHARDSON PATRICK WESTBROOK &
BRICKMAN, LLC
1513 Hampton Street, 1st Floor
Columbia, SC 29201
(803) 259-3527
Facsimile: (803) 259-4403
wlewis@rpwb.com

ATTORNEYS FOR RELATOR
RATLIFF CPA FIRM, P.C.

June 23, 2020
Columbia, South Carolina.